Brian S. King, #4610
Brent Newton, #6950
Nediha Hadzikadunic, #15851
**BRIAN S. KING, P.C.**
336 South 300 East, Suite 200
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
nediha@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ANNE M., DAVID W., and E.W-M., <br><br> Plaintiffs, <br><br> vs. <br><br> UNITED BEHAVIORAL HEALTH, and the MOTION PICTURE INDUSTRY HEALTH PLAN for ACTIVE PARTICIPANTS. <br><br> Defendants. | COMPLAINT <br><br> Civil No. 2:18-cv-00808 TS |

Plaintiffs Anne M. ("Anne"), David W. ("David"), and E. W-M. ("E."), through their undersigned counsel, complain and allege against Defendants United Behavioral Health ("UBH") and the Motion Picture Industry Health Plan for Active Participants ("the Plan") as follows:

**PARTIES, JURISDICTION AND VENUE**

1. Anne, David, and E. are natural persons residing in Westchester County, New York. Anne and David are E.'s parents.

1

2. The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). Anne was a participant in the Plan and E. was a beneficiary of the Plan at all relevant times.

3. The Plan offers medical coverage for participants through Anthem Blue Cross. Mental Health coverage for the Plan is provided by UBH. UBH, acting either in its own capacity or under the brand name Optum, denied residential treatment claims for services provided to E.

4. UBH is a subsidiary of United Healthcare, an insurance company headquartered in Hennepin County, Minnesota. UBH was the claims administrator for mental health claims under the Plan. This lawsuit is brought to obtain the Court's order requiring UBH to pay E.'s unpaid expenses incurred during treatment.

5. E. received medical care and treatment at Uinta Academy ("Uinta"), a licensed residential treatment facility located in Utah. Uinta provides sub-acute treatment to adolescent girls who have experienced trauma and have mental health, behavioral, or substance abuse problems.

6. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

7. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because the claims and appeals process took place in a UBH office in Utah, and because the treatment at issue took place in Utah. Finally, in light of the sensitive nature of the medical treatment at issue, it is the Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely their privacy will be preserved.

8. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendant's violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### E.'s Developmental History and Medical Background

9. Anne and David adopted E. from Ecuador at the age of 14 months. From the time E. was 12 years old, she began to self-harm by cutting herself, and started experimenting with alcohol, tobacco, and illegal drugs. E. had multiple visits with a psychiatrist during this timeframe.

10. When E. was 14, she was raped by a 19 year old male friend. After this incident, E. began to exhibit hypersexualized behavior. She got into cars with strangers, ran away from home, and engaged in inappropriate behavior with older men. E.'s self-harming behaviors and drug abuse intensified after this incident.

11. E. was an argumentative teenager and lashed out emotionally and physically. She broke windows and damaged property at home, had frequent panic attacks, and was physically and verbally abusive with her parents. Anne and David grew concerned about their own safety, as well as for the wellbeing of E.'s younger siblings. E. continued to lash out and to self-harm, and attempted suicide by overdosing on Advil.

12. E. was repeatedly hospitalized for these behaviors. On July 21, 2014, E. was admitted to an outdoor behavioral health program called New Vision Wilderness shortly after an acute hospitalization. The staff at New Vision Wilderness recommended that E. receive

further treatment following her discharge. On their recommendation E. was admitted to an Arizona facility called Spring Ridge Academy on September 5, 2014.

13. At Spring Ridge Academy. E.'s psychologist noted that E. had been diagnosed with Post-Traumatic Stress Disorder, Attention Deficit Hyperactivity Disorder, Bipolar Disorder, Reactive Attachment Disorder, and Major Depressive Disorder. E.'s November 5, 2014, discharge summary from Spring Ridge Academy stated in part:

> …9/17/14 [E.] drank hair spray and was placed on Safety. 9/18/14 [E.] ran out of group therapy after being invited to process her thoughts and emotions around her actions the previous evening. Staff stayed with her as she began to leave campus. She punched a light on the way out of the building. Police were notified. When police encountered [E.] she punched one of the officers. She was arrested. [E.] returned to campus the next day and resumed her work. She chose to use this incident as a motivating factor to work her program.
>
> 11/3/14 [E.] knew the court date for the above incident was coming soon. …Her agitation increased and she was unable to bring herself to calm. [E.] refused support by staff and students. Later she yelled and cursed at two staff, shoved past one and punched the other. Police were called and [E.] was arrested. Parents were notified that [E.] could not return to SRA. …

**Uinta**

14. After E. was expelled from Spring Ridge Academy, she was admitted to Uinta on November 14, 2014. By the time E. was admitted to Uinta she had undergone seven separate acute hospitalizations, along with numerous other attempts to treat her at a lower level of care. E.'s treatment team at Spring Ridge Academy recommended that E. continue to receive intermediate care. E.'s discharge summary stated in part:

> If E. does not receive this level of care it is highly likely she will return to unhealthy patterns and behaviors which will continue to escalate due to lack of structure and supervision and required therapeutic support for E. to maintain positive changes.

15. Initially payment for E.'s treatment at Uinta was denied in a series of Optum Explanation of Benefits forms "due to No Authorization." Anne appealed this denial on January 6,

4

2017, quoting the preauthorization section of the Summary Plan Description, which stated in part: "An OptumHealth Claim will not be denied on the basis that it was not preauthorized, but it may not be covered due to other benefit limitations or Exclusions or lack of medical necessity." Anne's letter was addressed to the Plan, not UBH. The Plan responded by requesting updated medical records.

16. On February 17, 2017, UBH sent Anne a denial letter which denied payment for reasons unrelated to preauthorization. The denial stated in part:

> …Your child was admitted to Residential Treatment, your child was not in danger of hurting himself, [sic] or anyone else. Your child did not need Residential treatment and could have been seen in an Outpatient Level of Care.
>
> Based on our Level of Care Guideline for the Mental Health Residential treatment it is my determination that no authorization can be provided 11/14/2015-07/31/2016, (261 days).

17. On August 15, 2017, Anne submitted a level one member appeal of the denial of E.'s treatment at Uinta. Anne argued that the Plan was subject to ERISA, and that she was entitled to receive specific references to the medical record and the Plan provisions that UBH had relied upon to come to the decision to deny care. Anne argued that it was difficult for her to properly appeal the denial when such meaningful information was withheld.

18. Anne stated that the denial letter inconsistently listed the denied dates of service as between November 14, 2015 and July 31, 2016 on page one and between November 14, 2015, to October 6, 2016, on page two. Anne wrote that the actual dates of service that E. received treatment at Uinta began a year earlier, between November 14, 2014, through October 6, 2016. Anne wrote that UBH had omitted 432 days of E.'s treatment from the

denial letter, and she requested that UBH review the whole timeframe of E.'s residential treatment, from her admission to discharge.

19. Anne questioned whether UBH had provided a full and thorough review of E.'s treatment. She took issue with the reviewer using the term "himself" to refer to E. She stated that E. was and has always been female, and has never referred to herself, or had others refer to herself as male.

20. Anne included a copy of E.'s medical records with the appeal. As late as June 15, 2016, E.'s records stated that "It is recommended that [E.] continue treatment at Uinta Academy as she continues to need a highly structured and supervised environment. If she were to discharge at this time it is highly likely she will relapse and return to old coping behaviors."

21. In addition, the medical records showed that E. continued to exhibit negative coping skills, including being physically and verbally abusive, having frequent debilitating flashbacks to her assault, self-harming, and expressing a desire to use drugs, and to commit suicide.

22. In an incident on May 5, 2015, E. took a metal broom and started using it to physically damage a vehicle. When staff attempted to intervene, E. broke the broom and used it to assault staff. It took multiple staff members to subdue E.

23. In a separate incident on April 26, 2016, E. was at the airport preparing for a home visit. She assaulted the two staff members she was with, and had to be restrained by five police officers. E. then spent the night in the airport detention center because she was deemed too aggressive to return to Uinta immediately after the incident.

24. Anne questioned how UBH could deem E. to not be a threat to herself or others, when she continued to self-harm and was arrested in the airport for assault. In addition, she argued that UBH's medical necessity criteria was contradictory and therefore impossible to satisfy, as UBH required that, "The member is not in imminent or current risk of harm to self, others and/or property" while simultaneously requiring that the member meet criteria such as: "Acute impairment of behavior or cognition that interferes with activities of daily living to the extent that the welfare of the member or others is endangered."

25. Anne concluded by arguing that the opinion of UBH reviewer Dr. Mayer that residential treatment was not justified, directly conflicted with the opinions of the medical professionals that had actually treated E.

26. On November 14, 2017, UBH sent Anne a letter upholding the denial of payment for E.'s treatment. Despite Anne's correction in her level one appeal, UBH again mistakenly referred to E. as "himself" in one part of the report. The reviewer gave the following justification for the denial:

> …I reviewed your child's medical record and it is my opinion that her condition did not meet criteria for this level of care. Your child could be treated in a less intensive level of care.
> In her case:
>
> - Your child was not feeling like harming himself [sic] or others.
> - Your child was not hearing or seeing things that others don't.
> - Your child was able to look after her day to day needs
> - Your child did not have severe medical problems that would require this level of care.
> - She was willing and able to participate in her treatment. She had a supportive family.
>
> The request cannot be approved at this time by your health plan. Instead your child could continue care in the Mental Health Intensive Outpatient setting with medication management, individual and family therapy. …

7

27. On December 26, 2017, Anne submitted a level two appeal of the denial of E.'s treatment at Uinta. Anne argued that UBH had used criteria meant for an individual receiving acute care in an inpatient psychiatric hospital to evaluate E.'s treatment, instead of criteria that would be appropriate for the sub-acute residential treatment E. received at Uinta.

28. Anne argued that the care provided at residential treatment centers like Uinta was in line with generally accepted standards of medical practice for individuals such as E. She contended that requiring acute symptomology as a prerequisite to qualify for sub-acute residential treatment as UBH was doing conflicted with widely accepted standards of medical practice.

29. Anne asserted that residential treatment had been recommended by professional clinicians who were intimately familiar with E. and her impairments, and that it was the most appropriate treatment modality for her. Anne stated that without the treatment E. received at Uinta, E.'s mental health conditions had the potential to seriously escalate to the point that she presented a risk of serious harm to herself or others.

30. Anne wrote that "It is disreputable as an insurance company to necessitate acute dangerousness for both residential treatment and inpatient hospitalization despite the fact that these facilities offer two distinct levels of care." Anne questioned how residential treatment and acute inpatient hospital care could both have the same requirements when they are not interchangeable services, and each offer separate and distinct levels of care.

31. She argued that UBH had imposed a non-quantitative treatment limitation in violation of MHPAEA by not providing mental health coverage at parity with comparable intermediate medical benefits offered by the Plan. She asserted that imposing restrictions

such as acute dangerousness on residential treatment without a comparable requirement on medical facilities such as skilled nursing facilities was a violation of MHPAEA.

32. Anne argued that the reviewer utilized by UBH was not qualified to conduct the review per the terms of ERISA. She wrote that while the reviewer was an MD, ERISA entitled Anne to have E.'s case reviewed by a specialist in adolescent psychiatry who also had experience treating individuals with symptoms similar to E.'s. Anne again stated that UBH had failed to provide specific references to the medical record it had relied upon to come to the decision to deny coverage.

33. Anne questioned whether her claim had been given a full and fair review, as the denial listed October 18, 2016, as E.'s discharge date when she was in fact discharged on October 6, 2016, and the denial had again mistakenly referred to E. as "himself".

34. UBH failed to respond to Anne's December 26, 2017, level two appeal. On June 29, 2018, Anne submitted an inquiry letter to UBH in an attempt to determine the status of her appeal. She stated that UBH had long passed the 30 days allowed by the terms of the Plan to respond to her appeal. Anne wrote that in spite of the passage of six months since she had sent the appeal via certified mail, and despite eight separate calls to UBH in the interim to ascertain the status of her appeal, she had still not received a response.

35. On July 3, 2018, UBH sent Anne a letter (misspelled as Ann) upholding the denial of E.'s treatment. The letter gave the following reason for upholding the denial:

> The non-coverage determination for residential level of care will be upheld on 11/14/2014 and forward. This is based on Optum Level of Care Guidelines for Residential Treatment of Substance Use Disorders and the Optum Common Criteria and Clinical Best Practices for All Levels of Care Level of Care Guidelines. You had long standing, chronic oppositional behaviors and limited coping skills. It appears that while you continued to require treatment for your symptoms, your care could have continued in a less intensive setting while living in a supported living environment.

36. Anne and David exhausted their pre-litigation appeal obligations under the terms of the Plan.

37. The denial of benefits for E.'s treatments was a breach of contract and caused Anne and David to incur medical expenses that should have been paid by the Plan in an amount totaling over $170,000.

## FIRST CAUSE OF ACTION

### (Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))

38. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as UBH, acting as agent of the Plan, to "discharge [its] duties in respect to claims processing solely in the interests of the participants and beneficiaries" of the Plan. 29 U.S.C. §1104(a)(1).

39. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

40. UBH and the Plan breached their fiduciary duties to E. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in E.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries and to provide a full and fair review of E.'s claims.

41. The actions of UBH and the Plan in failing to provide coverage for E.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

## SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

42. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA.

43. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

44. Specifically, MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

45. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to: medical management standards limiting or excluding benefits based on medical necessity, restrictions based on geographic location, facility type, provider specialty, and other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(H).

46. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for E.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities. For none of these types of treatment does the Plan exclude coverage for medically necessary care of medical/surgical conditions based on geographic location,

facility type, provider specialty, or other criteria in the manner UBH excluded coverage of treatment for E. at Uinta.

47. The actions of UBH and the Plan in requiring that E. satisfy acute care medical necessity criteria deviate from the Plan's operation in evaluating the medical necessity of treatment for sub-acute care for individuals being treated for medical/surgical conditions in violation of MHPAEA.

48. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and UBH, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

49. The actions of UBH and the Plan, as outlined above, have caused damage to Anne and David in the form of denial of payment in an amount totaling over $170,000 for medical services provided to E.

50. The violations of MHPAEA by UBH and the Plan give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to: surcharge, estoppel, restitution, disgorgement, injunction, accounting, constructive trust, equitable lien, declaratory relief, unjust enrichment, and specific performance, together with prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g).

WHEREFORE, the Plaintiffs seek relief as follows:

1.      Judgment in the total amount that is owed for E.'s medically necessary treatment at

       Uinta under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2.     Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

3.     Appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of MHPAEA;

4.     For such further relief as the Court deems just and proper.

DATED this 17th day of October 2018.

                                   By    s/ Brian S. King
                                              Brian S. King
                                              Attorney for Plaintiffs

County of Plaintiffs' Residence:
Westchester County, New York