IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ANNE M. *et al*.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED BEHAVIORAL HEALTH and MOTION PICTURE INDUSTRY HEALTH PLAN FOR ACTIVE PARTICIPANTS,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:18-cv-808<br><br>Howard C. Nielson, Jr.<br>United States District Judge |

Plaintiffs Anne M., David W., and E.W.-M. sue United Behavioral Health and the Motion Picture Industry Health Plan for Active Participants, asserting two claims under ERISA (the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.*): (1) a claim for payment of improperly denied benefits, and (2) a claim for violations of the Mental Health Parity and Addiction Equity Act. Both sides move for summary judgment. For the following reasons, the court grants summary judgment in favor of Defendants.

**I.**

Anne M. was a member of the Plan, and her daughter, E.W.-M., was a beneficiary. *See* AR 1004; Dkt. No. 41 ¶ 2.[1] The Plan provides medical and surgical benefits through Anthem Blue Cross and mental health and substance abuse benefits through United. *See* AR 902–10, 930.

---

[1] References to the administrative record are cited as "AR XXX." The administrative record can be found at Docket Numbers 75 & 76.

The Plan names United as a fiduciary with respect to "benefits determinations and payments" and "performing the fair and impartial review of first level appeals." AR 3180. And the Plan delegates to United discretionary authority to "construe and interpret terms of the Plan" and to "determine the validity of charges submitted to [United] under the Plan." *Id.*

The Plan covers services "for which the Plan has established a benefit" that are "medically necessary and reasonable." AR 913. To be "medically necessary," health care must be "procedures, treatments, supplies, devices, equipment, facilities or drugs" that a medical practitioner, exercising prudent clinical judgment, would provide "for the purpose of preventing, evaluating, diagnosing or treating an illness, injury or disease or its symptoms." *Id.* Such medical care must also be: (1) "[i]n accordance with generally accepted standards of medical practice"; (2) "[c]linically appropriate in terms of type, frequency, extent, site and duration" and considered effective for the patient's condition; (3) "[n]ot primarily for the convenience of the patient, physician or other health care Provider"; and (4) "[n]ot more costly than an alternative" that is "likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's [condition]." *Id.*

The Plan expressly covers "outpatient and inpatient mental health care." AR 930. If such services are not medically necessary, however, they are excluded. *See* AR 944. "Routine custodial, and convalescent care, long-term therapy and/or rehabilitation" are also excluded. *Id.*

To assist in evaluating claims, United promulgated the Optum "Level of Care Guidelines." These guidelines are "objective and evidence-based behavioral health criteria" "derived from generally accepted standards of practice for the treatment of behavioral health conditions." AR 1067. United uses these guidelines "to standardize coverage determinations, promote evidence-based practices, and support members' recovery, resiliency, and wellbeing."

2

*Id.* The guidelines are also explicitly used to make "medical necessity determinations." AR 1070. The guidelines incorporate medical necessity criteria that are almost identical to those set forth in the Plan. *See id.*; AR 913.

The Guidelines for Mental Health Residential Treatment Center Level of Care define a Residential Treatment Center as "[a] [sub-acute] facility-based program which delivers 24-hour/7-day assessment and diagnostic services, and active behavioral health treatment to members who do not require the intensity . . . offered in Inpatient." AR 1081.[2] Treatment is focused on "addressing the 'why now' factors that precipitated admission" such as "changes in the member's signs and symptoms, psychosocial and environmental factors, or level of functioning" until the member's condition can be "safely, efficiently and effectively treated in a less intensive level of care." *Id.*

For residential treatment to be covered under these guidelines, (1) the member must meet the "Common Criteria for All Levels of Care," (2) the member must not be "in imminent or current risk of harm to self, or others, and/or property," and (3) the member's symptoms cannot "be safely, efficiently or effectively assessed and/or treated in a less intensive setting due to acute changes in the member's [condition] and/or psychosocial and environmental factors." AR 1081–82. Treatment in a residential treatment center is covered if the member experiences either "[a]cute impairment of behavior or cognition that interferes with activities of daily living" and endanger the welfare of the member or others or "[p]sychosocial and environmental problems that are likely to threaten the member's safety or undermine engagement in a less intensive level of care." AR 1082–83.

---

[2] The explicit requirement that a Residential Treatment Center be a "sub-acute" facility-based program was added in the 2015 and 2016 guidelines.

Continued treatment in a residential treatment center is not covered if it is primarily for the purpose of providing custodial care, which includes "services that don't seek to cure, are provided when the member's condition is unchanging, are not required to maintain stabilization, or don't have to be delivered by trained clinical personnel." AR 1081–82. The "Common Criteria" further require that there be a "reasonable expectation that services will improve the member's presenting problems within a reasonable period of time," such as by the "reduction or control of the acute signs and symptoms that necessitated treatment" at this "level of care." AR 1074.

Beginning in late 2012, E.W.-M. displayed escalating behavioral issues, resulting in multiple hospitalizations. *See* AR 1392. In June 2014, E.W.-M. was admitted to New Vision Wilderness, an outdoor behavioral health program. *See* AR 1558. After her discharge from New Vision, E.W.-M. received further treatment at Spring Ridge Academy beginning in September 2014. *See* AR 1572. E.W.-M.'s time at Spring Ridge was tumultuous—among other things, she was arrested twice for assaulting staff and police officers. *See* AR 3664–65. After the second arrest on November 3, 2014, E.W.-M.'s parents were informed that she could not return to the facility. *See id.*

E.W.-M. was then admitted to Uinta Academy, a residential treatment facility, on November 14, 2014. *See* AR 1604–05. The master treatment plan listed E. W.-M.'s diagnoses as "Reactive Attachment Disorder of Infancy or Early Childhood, combination of inhibited and disinhibited type"; "Post traumatic stress disorder secondary to sexual abuse history; chronic; in partial remission"; "Anxiety Disorder NOS"; "Attention Deficit Hyperactivity Disorder, Predominately Inattentive Type"; "Polysubstance Dependence, in partial remission due to being

placed in a RTC"; and "Problems Related to the Social Environment, Educational Problems, Poor Coping Skills, Sexual Trauma." AR 2757.

E.W.-M.'s condition at Uinta varied. On two occasions she was violent with staff, *see* AR 3059–60, 4297–98, and she also twice engaged in self-harm, *see* AR 3058, 3063. Despite some setbacks, E.W.-M. also developed coping skills and learned to better manage her condition, however. *See* AR 3061, 3859. E.W.-M. successfully completed the program at Uinta and was discharged on October 6, 2016. *See* AR 3679, 3682.

At that point, E.W.-M.'s diagnoses had been updated—Reactive attachment disorder was removed because she did not meet the criteria, polysubstance dependence was changed to "Other Substance Use Disorder, in remission, not a focus of treatment," and "Anxiety Disorder NOS" was changed to "Generalized Anxiety Disorder." AR 3679. Her discharge summary explained that she "had shown the ability to manage her anxiety" and "appear[ed] emotionally regulated and congruent." AR 3682. She did not show "behaviors of isolation" or "avoidance" and was "aware of her emotions and thoughts." *Id.* "Her self-awareness ha[d] helped keep [her] grounded and focused." *Id.* But E.W.-M. continued to have "thinking errors" that affected her emotions, and she appeared "agitated over things she cannot control." *Id.*

Beginning in September 2015, Uinta filed claims for all 693 days of E.W-M.'s treatment. *See* AR 1604–66. After initially paying the claims for E.W.-M.'s first year at Uinta, *see* AR 1667–716, 1721–25, United subsequently denied all claims for her treatment there, *see* AR 3429–58.[3]

---

[3] The reason for this reversal is not clear. The explanations of benefits reference an accompanying letter that does not appear to have been included in the administrative record.

After an initial review and level one appeal that was closed when Anne M. failed to provide requested information, United ultimately conducted a retrospective review of Plaintiffs' requests for coverage on February 16, 2017. *See* AR 1560–61. Dr. Teresa Mayer performed a "Peer/Admin Review" that day. *See id.* Dr. Mayer noted that

> At the time of admission and throughout her stay member appeared to be at her baseline level of functioning. The member is attending school, and this facility is a long term [Residential Treatment Center], rather than acute stabilization. Member was not in any danger and did not require 24 hour monitoring. Member did not have behavioral disruption while in treatment, or need for multiple medication changes. Member could have been safely and effectively treated at a lower level of care such as mental health intensive outpatient services. There is insufficient evidence to support [mental health residential treatment] from 11/14/2015-7/31/2016.

AR 1562.

Dr. Mayer issued an initial denial letter the next day. *See* AR 3041. She explained that after reviewing the plan for E.W.-M.'s admission to Uinta and "the available documentation and all information received to date," coverage was not available because at the time of admission, E.W.-M. was not "in danger of hurting himself [sic], or anyone else" and she "did not need Residential treatment" and "could have been seen in an Outpatient Level of Care." *Id.* Based on the Residential Mental Health Guidelines, Dr. Mayer thus determined "that no authorization [could] be provided [from] 11/14/2015–07/31/2016," *id.*, and that "coverage [was] not available under [the] benefit plan for [E.W.-M.'s] admission to UINTA" from "11/14/2015 through 09/01/2016," AR 3042.

Anne M. then filed a level one member appeal on August 15, 2017. *See* AR 3051. She referenced Dr. Mayer's denial letter and sought review of E.W.-M.'s entire course of treatment at Uinta—November 14, 2014, through October 18, 2016. *See id.* She argued that E.W.-M.'s treatment fit "the criteria necessary for coverage" and specifically contested Dr. Mayer's conclusion that E.W.-M. was "not in danger of hurting herself or others." *Id.* She further argued

6

that United had failed to comply with the requirements of ERISA and took issue with the inconsistent denial dates and the improper pronoun use in Dr. Mayer's letter. *See* AR 3052–53. She also provided a detailed account of E.W.-M.'s medical history, *see* AR 3053–66, and included various medical records, *see* AR 3529–6127.

Dr. Svetlana Libus reviewed the appeal on November 13, 2017. *See* AR 1565. In her internal notes, Dr. Libus observed that E.W.-M. had a long history of behavioral problems, including being verbally and physically aggressive at home; was struggling with feelings of depression and anxiety; and had previously been sexually assaulted. *See id.* Dr. Libus noted that E.W.-M. had been discharged from the previous residential treatment center with "very little progress in terms of her compliance and aggressive behavior" and that some of her aggressive behavior had continued when she visited her home during this program. *Id.* But Dr. Libus also noted that on admission, E.W.-M. denied suicidality, homicidality, or psychosis and she did not "present w[ith] any major behavior problems except for episodes of aggressive [behavior], esp[ecially] towards her parents." AR 1566. Dr. Libus concluded that while "[i]t appears that she might [have] needed placement" of some sort, her condition could have been "effectively treated at a lower level of care such as mental health intensive outpatient services." *Id.*

Dr. Libus upheld the denial decision in a letter issued November 14, 2017. *See* AR 3119–20. Dr. Libus stated that she had reviewed the "LINX Notes Medical record from provider, Letter from parent, [and] Optum's Guidelines for Mental Health Residential Treatment Center Level of Care." AR 3119. Dr. Libus denied coverage for the entirety of E.W.-M.'s treatment, explaining that she could have been treated in a less intensive level of care. *See id.* Dr. Libus specifically noted that E.W.-M. "was not feeling like harming himself [sic] or others"; she "was not hearing or seeing things that others don't"; she "was able to look after her day to day needs";

she "did not have severe medical problems that [required] this level of care"; "[s]he was willing and able to participate in her treatment"; and "[s]he had a supportive family." AR 3119–20. Dr. Libus thus concluded that E.W.-M. "could have continued care in the Mental Health Intensive Outpatient setting with medication management, individual and family therapy." AR 3120.

On December 26, 2017, Anne M. initiated a full, level two member appeal of the denial of E.W.-M.'s treatment. *See* AR 6144. Again, Anne M. contested the reviewer's determinations and more broadly challenged United's residential mental health guidelines—asserting that the guidelines require "acute" symptoms for "subacute" treatment. AR 6145. She also alleged a Parity Act violation and argued that United's medical necessity determination was flawed. *See* AR 6147–49. Further, Anne M. challenged Dr. Libus's credentials, arguing that the reviewer needed to be a "clinician who specializes in adolescent psychiatry and who has experience providing treatment in a residential setting to adolescents diagnosed with severe depression, suicidal behavior, and post-traumatic stress disorder." AR 6150. Finally, Anne M. noted several mistakes in Dr. Libus's letter, including improper pronoun use and incorrect dates of service (E.W.-M. was discharged on October 6, 2016, not October 18th as stated in the letter). *See* AR 6151.

Dr. Sherifa Iqbal reviewed the level two appeal on June 26, 2018. *See* AR 1571. Dr. Iqbal noted that E.W.-M. had "long-standing behavioral issues that were both chronic and sporadic in nature." AR 1572. She further noted that E.W.-M. "was not having an acute exacerbation of mental health issues such as [suicidal ideation], [homicidal ideation] or psychosis." *Id.* E.W.-M. did have "sporadic episodes of aggression, lying, and somewhat manipulative behavior while she was in the program but these episodes were noted to be interspersed with periods of euthymia, positive outlook and generally being cooperative." *Id.* It thus appeared that Uinta "was serving as

form of placement while the patient worked on long term, chronic, maladaptive coping skills and behavioral issues." *Id.* Dr. Iqbal noted that her conclusion was consistent Uinta's recommendation for E.W.-M.'s further placement after discharge. *See id.*

Dr. Iqbal upheld the prior determinations in a letter dated July 3, 2018. *See* AR 3159–60. Dr. Iqbal explained that after reviewing the "medical records, United case records and the letter requesting the appeal," she determined that benefit coverage was not available based on the "Optum Level of Care Guidelines for Residential Treatment of Substance Use Disorders and the Optum Common Criteria and Clinical Best Practices for All Levels of Care Level of Care Guidelines." *Id.* Specifically, Dr. Iqbal noted that E. W.-M. "had long standing, chronic oppositional behaviors and limited coping skills." *Id.* Thus, while "[i]t appear[ed] that . . . [E. W.-M.] continued to require treatment for [her] symptoms, [her] care could have continued in a less intensive setting while living in a supported living environment." *Id.* Dr. Iqbal accordingly denied all benefits from November 14, 2014, to October 6, 2016, and noted that this was the "Final Adverse Determination" and that all internal appeals were exhausted. AR 3160.

Plaintiffs then brought this suit.

## II.

When both parties in an ERISA case have "moved for summary judgment and stipulated that no trial is necessary, summary judgment is merely a vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor." *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) (quotation omitted). The court reviews a denial of benefits covered by ERISA "under a *de novo* standard unless the benefit plan gives the administrator or fiduciary

discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

"Where the plan gives the administrator discretionary authority, however, '[courts] employ a deferential standard of review, asking only whether the denial of benefits was arbitrary and capricious.'" *LaAsmar*, 605 F.3d at 796 (quoting *Weber v. GE Group Life Assurance Co.*, 541 F.3d 1002, 1010 (10th Cir. 2008)). Under this standard, "review is limited to determining whether the interpretation of the plan was reasonable and made in good faith." *Kellogg v. Metro. Life Ins. Co.*, 549 F.3d 818, 826 (10th Cir. 2008) (cleaned up). The administrator's decision will be upheld unless it is "not grounded on *any* reasonable basis." *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098 (10th Cir. 1999) (cleaned up). "This standard is a difficult one for a claimant to overcome." *Nance v. Sun Life Assurance Co. of Canada*, 294 F.3d 1263, 1269 (10th Cir. 2002).

## III.

The court begins with Plaintiffs' claim for payment of improperly denied benefits. The parties dispute both the applicable standard of review and the merits. The court begins with the standard of review.

## A.

The Plan expressly grants United discretionary authority to make benefits determinations, *see* AR 3180, and United argues that its denial of benefits here should therefore be reviewed under the "arbitrary and capricious" standard, *see* Dkt. No. 72 at 25–26. Plaintiffs do not dispute that the Plan's language would ordinarily entitle United to arbitrary and capricious review but instead argue that *de novo* review is required in this case because of United's procedural violations during the claims process. *See* Dkt. No. 74 at 19–26.

10

The Tenth Circuit has held that *de novo* review is appropriate despite a delegation of discretionary authority when the case involves "serious procedural irregularities." *Martinez v. Plumbers & Pipefitters Nat'l Pension Plan*, 795 F.3d 1211, 1215 (10th Cir. 2015). But the Tenth Circuit has also long held that even if technical procedural violations have occurred, arbitrary and capricious review of an administrator's decision is still warranted so long as the administrator has substantially complied with the regulations. *See Gilbertson v. Allied Signal, Inc.*, 328 F.3d 625, 634–35 (10th Cir. 2003); *Kellogg*, 549 F.3d at 828. Although Plaintiffs argue that this standard is inapplicable in light of subsequent regulatory changes, *see* Dkt. No. 74 at 20–22, the court need not address this issue further in this case because it concludes that United failed to "substantially comply" with ERISA's regulatory procedures.

When a group health plan provides two appeals of an adverse determination, the plan must render a decision, with respect to each appeal, within "30 days after receipt by the plan of the claimant's request for review of the adverse determination." 29 C.F.R. § 2560.503-1(i)(2)(iii)(A) (2017). Here, Plaintiffs initiated a second level appeal on December 26, 2017. *See* AR 6144. United appears to have received the appeal letter on January 2, 2018, and initially misclassified it. *See* AR 1566–67, 1597. This was corrected on February 20, 2018. *See* AR 1566–67. United, however, did not issue its determination until July 3, 2018. *See* AR 3159.

In *LaAsmar*, the Tenth Circuit held that a 170-day delay in rendering an appeal determination did not "substantially comply" with the procedural requirements because the delay did not occur within "the context of an on-going, good-faith exchange of information between the administrator and the claimant." 605 F.3d at 800 (quotation omitted). The court explained that there was no evidence in the record that the administrator had been engaged in "an on-going productive evidence-gathering process in which the claimant is kept reasonably well-informed as

to the status of the claim and the kinds of information that will satisfy the administrator." *Id.* (quotation omitted). Instead, in response to a letter from the claimant's attorney, the administrator represented that it was still evaluating the case and it did not appear that the administrator was attempting to gather additional evidence. *See id.*

In this case, United issued its decision 182 days after it received Plaintiffs' appeal and 133 days after the date it reclassified the appeal. Plaintiffs submitted a letter inquiring about the status of the second appeal on June 29, 2018. *See* AR 3147. They explained that their "healthcare advocate" had spoken with a United representatives by phone eight times between February 20th and June 25th. *See* AR 3147–48. United's internal notes indicate that this appeal was initially classified as a duplicative appeal but was reclassified as a second level appeal on February 20, 2018, after a call from Plaintiffs' representative. *See* AR 1566–67. United then repeatedly informed Plaintiffs' representative that the appeal was under review and would require more time. *See* AR 1567–71. United's notes indicate that it was dealing with some sort of issue but provide no further clarification regarding what that issue was. *See id.*

In short, the court can find nothing in the record demonstrating that United's delay in resolving the second level appeal was fairly attributable to an "on-going productive evidence gathering process" as opposed to just "evaluating the case." It follows that United did not substantially comply with ERISA's regulatory framework for rendering an appeal decision. The court will therefore review the challenged benefits determination *de novo*.

## B.

The court reviews both the interpretation of the terms of the plan and United's decision to deny benefits *de novo*. *See LaAsmar*, 605 F.3d at 800. Plaintiffs have the burden of establishing that E.W.-M.'s treatment was covered. *See id.* In reviewing United's determination, the court is

limited to the rationale given by United for the denial of benefits. *See Kellogg*, 549 F.3d at 828–29. "To determine whether a plan administrator considered and asserted a particular rationale, [the court must] look only to those rationales that were specifically articulated in the administrative record as the basis for denying a claim." *Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1190 (10th Cir. 2007). Although the plan administrator must have stated the specific reason for denying benefits in the administrative record, it is not required to have given "the reasoning behind the reasons." *Id.* at 1192 (quotation omitted).

Here, all three denial letters concluded that E.W.-M.'s treatment at Uinta was not medically necessary. Dr. Mayer explained in the first denial letter that under the Residential Mental Health guidelines, E.W.-M. "did not need Residential treatment and could have been seen in an Outpatient Level of Care." AR 3041. Dr. Libus likewise concluded that E.W.-M. could have been "treated in a less intensive level of care" and "did not meet the criteria for" Residential Mental Health treatment under the guidelines. AR 3119. Finally, Dr. Iqbal explained that "while [E.W.-M.] continued to require treatment for [her] symptoms, [her] care could have continued in a less intensive setting while living in a supported environment." AR 3159.[4]

---

[4] In her letter, Dr. Iqbal purported to base this determination on the "Residential Treatment of Substance Use Disorders" guidelines, rather than the Residential Mental Health Guidelines. *See* AR 3159. After oral argument, United submitted an affidavit from Dr. Iqbal explaining that she had in fact relied on the Residential Mental Health Guidelines but had inadvertently referenced the wrong guidelines in her letter. *See* Dkt. No. 103 at 2. In all events, Dr. Iqbal also cited the "Common Criteria and Clinical Best Practices for All Levels of Care" guidelines. *See* AR 3159. And the "Common Criteria" required Dr. Iqbal to determine whether E.W.-M.'s condition could be "treated in a less intensive setting" and what treatment was "[c]linically appropriate for *the member's behavioral health condition*." AR 1072, 1074 (emphasis added). For these reasons, the court concludes that Dr. Iqbal's erroneous reference to the incorrect guideline in her letter was "inconsequential" and that the substance of the letter gave Plaintiffs notice of the actual basis of the denial. *See Mote v. Aetna Life Ins. Co.*, 502 F.3d 601, 605 n.2 (7th Cir. 2007).

The Plan provides that to be deemed medically necessary, treatment must be "[i]n accordance with generally accepted standards of medical practice," AR 913, and United's guidelines, which were used here, are "derived from generally accepted standards of practice for the treatment of behavioral health conditions," AR 1067. These guidelines describe a residential treatment center as a stabilization facility where treatment is focused on addressing the acute changes in the member's condition that "precipitated admission" so that the member's condition "can be safely efficiently and effectively treated in a less intensive level of care." AR 1081. Under the guidelines, long-term care is not the goal of residential treatment—to the contrary, a member is ineligible for continued service if his or her "condition is unchanging." AR 1081–82. The guidelines thus make clear that treatment at a residential treatment center is only deemed medically necessary to address a short-term change in a member's condition that renders outpatient treatment temporarily inadequate.

For long-term care to be covered under the Plan, it must instead be provided through outpatient treatment. Unlike treatment in a residential treatment center, outpatient treatment is "focused on addressing the 'why now' factors that precipitated admission . . . to the point that [those] factors . . . *no longer require treatment*," and the Outpatient Mental Health Guidelines do not require any additional criteria for continued care beyond the "Common Criteria for all Levels of Care." AR 1078 (emphasis added).

It follows, under these guidelines, that residential treatment would be deemed medically necessary and therefore covered under the Plan only if there were "acute changes" in E.W.-M.'s condition that temporarily necessitated residential treatment in order to enable her to return to outpatient treatment. *See* AR 1081–82. Here, Plaintiffs point to E.W.-M.'s expulsion from Spring Ridge Academy, her previous hospitalizations, and failed attempts of treatment at lower levels of

14

care as evidence that she needed residential treatment. *See* Dkt. No. 74 at 8. The court concludes that this showing is inadequate to demonstrate that residential treatment was appropriate under the terms of the guidelines because it does not indicate that E.W.-M. needed "acute stabilization" as opposed to long-term structured care.

E.W.-M. was expelled from Spring Ridge Academy after she assaulted two staff members and was arrested. *See* AR 3664–65. But she had also assaulted a police officer six weeks earlier. *See* AR 3664. And the record makes clear that this pattern was long standing. E.W.-M. had been hospitalized at least six different times over the course of three years for depression, suicidality, and anger, including an admission after assaulting her mother in February 2014. *See* AR 1398, 3054–55. Thus, rather than an acute change in E.W.-M.'s behavior, the record suggests that there was no change.

Nor did Spring Ridge Academy note any acute change in E.W.-M.'s condition. Her discharge notes from Spring Ridge Academy recommended a therapist to address her behavioral and mental health issues and an academic program to assist her educational and sociological development. *See* AR 3665. Those notes further explained that E.W.-M. "will need a secure, structured environment where she can feel safe and continue to address her trauma issues." *Id.* These recommendations indicate that E.W.-M. needed long-term care and are consistent with Uinta's discharge notes nearly two years later. Uinta recommended that E.W.-M. "transition to a co-ed therapeutic boarding school that will support [her] in maintaining her emotional progress and provide the required educational support within the classroom. [She] requires a highly structured and supervised environment to encourage use of her skills and further therapeutic progress." AR 3682. Thus, rather than providing acute stabilization as required by guidelines,

15

Uinta instead appears to have functioned as a long-term structured environment for E.W.-M. to receive therapeutic treatment and educational assistance.

All three of United's reviewers reached this same conclusion. Dr. Mayer noted that "[a]t the time of admission and throughout her stay," E.W.-M. "appeared to be at her baseline level of functioning." AR 1562. She observed that E.W.-M. was attending school, and Uinta was "a long term [residential treatment center], rather than acute stabilization." *Id.* Likewise, Dr. Libus noted that "this facility was a long term [residential treatment center]." AR 1566. And Dr. Libus further concluded that while E.W.-M. might have "needed placement" somewhere, "[s]he did not present w[ith] any major behavior problems except for episodes of aggression" and "the 'why now' factors leading to admission" and her history of treatment did not suggest that "there was acute impairment of behavior or cognition." *Id.* Finally, Dr. Iqbal noted that E.W.-M. had "long-standing behavioral issues that were both chronic and sporadic in nature." AR 1572. She further noted that E.W.-M. "was not having an acute exacerbation of mental health issues such as [suicidal ideation,] [homicidal ideation] or psychosis," and that E.W.-M.'s "sporadic episodes of aggression, lying, and somewhat manipulative behavior" were "interspersed with periods of euthymia, positive outlook and generally being cooperative." *Id.* It thus appeared that Uinta "was serving as form of placement while [E.W.-M.] worked on long term, chronic, maladaptive coping skills and behavioral issues." *Id.* This conclusion was consistent with Uinta's recommendation that E.W.M receive further placement upon discharge. *See id.*

It does not follow that the treatment E.W.-M. received at Uinta was not beneficial. To the contrary, the record indicates that she made improvements over the course of her nearly two years at the facility. *See* AR 3679–82. But ERISA "protect[s] contractually defined benefits," *Firestone*, 489 U.S. at 113 (quotation omitted), and the contract at issue here does not provide

benefits for the type of long-term care that E.W-M. received at Uinta. Instead, this contract covers such care only if it is provided through outpatient treatment.

For these reasons, the court concludes that United did not improperly deny payment of benefits for E.W.-M.'s treatment.

## IV.

Finally, the court addresses Plaintiffs' Parity Act claim. Plaintiffs argue that the Plan violates the Parity Act because it imposes more restrictive requirements for mental health care than for analogous medical or surgical care. Specifically, Plaintiffs contend that the medical necessity criteria for residential mental health treatment require the presence of acute symptoms while the medical necessity criteria for analogous residential medical or surgical care do not.

In pertinent part, the Parity Act requires that "treatment limitations applicable to . . . mental health or substance use disorder benefits" be "no more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits covered by the plan." 29 U.S.C. § 1185a(a)(3)(A)(ii). In addition, the plan cannot have "separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits." *Id.* The Act's definition of a "treatment limitation" includes "limits on the frequency of treatment, number of visits, days of coverage, or other similar limits on the scope or duration of treatment." *Id*. § 1185a(a)(3)(B)(iii).

The enacting regulations make clear that this includes "nonquantitative treatment limitations," including (among other things) "[m]edical management standards limiting or excluding benefits based on medical necessity or medical appropriateness." 29 C.F.R. § 2590.712(a) & (c)(4)(ii). For purposes of comparing treatment limitations, the regulations establish various "classifications" of levels of care and within each classification require

consistent treatment of mental health or substance abuse care, on the one hand, and of medical or surgical care, on the other hand. *See id.* § 2590.712(c)(2)(ii)(A).

Here, the parties point to Anthem's subacute inpatient level of care as the appropriate analog to United's Residential Treatment Center level of care. *See* Dkt. No. 94 at 20. To prevail under the Parity Act, Plaintiffs must demonstrate "a disparity between the treatment limitation on mental health/substance abuse benefits as compared to the limitations that defendants would apply to the covered medical/surgical analog." *J.W. v. Bluecross Blueshield of Texas*, No. 1:21-cv-21, 2022 WL 2905657, at *5 (D. Utah July 22, 2022) (quotation omitted).

As explained above, the Optum Guidelines for Residential Mental Health Treatment state that to qualify for coverage of residential mental health treatment, the patient cannot be "in imminent or current risk of harm to self or others and/or property"; the "[c]o-occurring behavioral health or physical conditions can be safely managed"; and "[t]he 'why now' factors leading to admission cannot be safely, efficiently or effectively assessed and/or treated in a less intensive setting due to acute changes in the member's signs and symptoms and/or psychosocial and environmental factors." AR 1081–82.

Conversely, Anthem's "Clinical UM Guideline" explains that inpatient subacute care is "a distinct form of health care service that focuses on providing the skilled medical care needed to transition individuals from the acute care setting." AR 3228. Such care will be deemed medically necessary, and thus covered, when the patient does "not require acute inpatient hospital or acute rehabilitative care but still require[s] highly skilled nursing and access to advanced therapies"; and has "medical needs greater than that which could be met in a home setting." AR 3229. Treatment at this level of care will not be covered, however, if "[t]he individual's condition has changed such that skilled medical or rehabilitative care is no longer

needed" or "[t]he individual has failed to make progress towards treatment goals during a medically reasonable (typically one [1] week) period." AR 3230.

Both guidelines thus impose substantially similar requirements for coverage. First, both sets of guidelines acknowledge that these levels of care are a step down from the most acute care setting and thus that some conditions will be too severe for treatment at this level. For example, the Optum guidelines explain that residential treatment is intended for "members who do not require the intensity of nursing care, medical monitoring and physician availability offered in Inpatient." AR 1081. Likewise, Anthem provides subacute care to members who "do not require acute inpatient hospital or acute rehabilitative care." AR 3229.

Conversely, both sets of guidelines recognize that some conditions will not be severe enough to warrant treatment at this level. Thus, under the Optum guidelines, residential treatment is deemed medically necessary only if "[t]he 'why now' factors leading to admission cannot be safely, efficiently or effectively assessed and/or treated *in a less intensive setting*." AR 1082 (emphasis added). Similarly, Anthem's subacute care is only covered if the patient has "needs greater than that which could be met in a home setting." AR 3229.

Finally, both sets of guidelines make clear that long-term treatment will not be covered at this level of care. Anthem expressly notes that treatment will no longer be deemed medically necessary if the patient's condition sufficiently improves, or the patient fails to make progress. *See* AR 3230. The Optum guidelines likewise explain that residential treatment "is focused on addressing the 'why now' factors that precipitated admission . . . to the point that the member's condition can be safely, efficiently and effectively treated in a less intensive level of care." AR 1081. Both sets of guidelines thus focus on short-term stabilization or improvement of the

patient's current conditions with a view to discharge as soon as treatment can be provided at a lower level of care.

Although the requirements set forth in these guidelines are not identical, the Parity Act requires only that nonquantitative treatment limitations for mental health benefits be "*comparable to*" and "applied no more stringently than for medical/surgical benefits." 29 C.F.R. § 2590.712(c)(4)(iii) (Example 4) (emphasis added). Plaintiffs have failed to demonstrate that there is any meaningful practical difference between the requirements for residential mental health treatment and those for subacute inpatient care.

The court also rejects Plaintiffs' contention that the United guidelines require the presence of "acute" symptoms for residential treatment to be covered. Instead, the guidelines look at "*acute changes* in the member's signs and symptoms." AR 1082 (emphasis added). This is consistent with Anthem's requirements. Because Anthem's subacute care serves primarily as a step down from acute inpatient treatment, admission is normally triggered by the dissipation of "acute symptoms." By contrast, United's residential treatment serves primarily as a step up from outpatient treatment. Admission thus focuses on changes in the patient's symptoms that render treatment at a lower level of care no longer feasible. In both instances, treatment will be covered if, in the judgment of the medical professional evaluating the claim, the patient's condition is too severe to allow for outpatient treatment but not severe enough to require inpatient or acute treatment.

This understanding of the guidelines is consistent with the denial letters in this case. Each letter determined that E.W.-M. could have been effectively treated a lower level of care and thus that residential treatment was inappropriate. The court concludes that United appropriately applied the guidelines to E.W.-M.'s condition in this case.

20

To the extent that Plaintiffs assert an as-applied challenge and argue that Anthem's guidelines are applied more leniently in practice than are the Optum guidelines, the court notes that Plaintiffs have failed to identify any evidence of how the Anthem guidelines are applied in practice or even any evidence, apart from E.W.-M.'s experience, of how the Optum guidelines are applied in practice. Absent such evidence, Plaintiffs' as-applied challenge necessarily fails.

For these reasons, the court rejects Plaintiffs' Parity Act claim.

\*       \*       \*

For the foregoing reasons, the court **GRANTS** Defendants' motion for summary judgment and **DENIES** Plaintiffs' motion for summary judgment.

**IT IS SO ORDERED.**

DATED this 19th day of August, 2022

_____
Howard C. Nielson, Jr.
United States District Judge

21